UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                          CASE NO. 06-10179

OCA, INC., et al                                               SECTION "B"

    DEBTORS                                            CHAPTER 11
**************************************************************************
OCA, INC., et al, and
ORTHODONTIC CENTERS OF GEORGIA, INC.
    Plaintiffs

VERSUS                                                         ADV.P.NO. 06-1113

HECTOR M. BUSH and
HECTOR M. BUSH, P.C.
    Defendants

## <u>MEMORANDUM OPINION</u>

This matter came on for trial on March 5 through March 14, 2007 on the complaint of the

debtors, OCA, Inc. And Orthodontic Centers of Georgia (collectively "OCA") against Dr. Hector

M. Bush and Hector M. Bush, P.C. (collectively "Bush") and the counterclaim thereto.  As set

forth more fully below, the court finds that the business services agreement between Bush and

OCA is not illegal as against public policy under Georgia law, that OCA breached the contract,

and that both parties are entitled to damages on certain of their claims as detailed hereinafter.

## I.    <u>Background Facts</u>

The debtor, OCA, Inc. ("OCA"), is a Louisiana company that provides services to

affiliated dental practices through separate subsidiaries that operate in each state where there is

an affiliated practice.  The basic business model of OCA and its subsidiaries is that they enter

into business services agreements ("BSAs") with affiliated dental practices, primarily

orthodontists.  OCA generally provides the necessities for starting up and running a dental

practice, i.e., office space, equipment, trained office staff, and computer software for managing the practice. In exchange the affiliated practice pays a monthly service fee based on a percentage of the practice's net operating margin.[1] These BSAs are the primary operating asset of OCA and are the means through which it generates its revenue.

OCA and Bush entered into a relationship on August 24, 1994 whereby Bush signed a letter agreement with OCA agreeing to perform work at offices in Macon and Columbus, Georgia. In March 1995 a second letter agreement was signed by the parties, and Bush purchased the Macon practice from another orthodontist affiliated with OCA. Finally, sometime in 2002 the parties entered into a Business Services Agreement ("BSA") that stated it was effective as of September 1, 1994; the BSA also stated that it, "supercedes and replaces in its entirety any prior agreements or understandings, written or oral, between the Parties regarding this Agreement."[2] The parties subsequently executed three amendments to the BSA, on February 1, 2004, June 15, 2004 and March 2, 2005.[3]

Throughout the time period he was associated with OCA, Bush either worked at or purchased several orthodontic practices in Georgia, as was reflected in the various agreements. Bush also actively participated in many OCA activities designed to help OCA grow. For example, Bush participated in a mentoring program designed to bring young orthodontists in as associates who might later purchase affiliated practices of their own. Bush also recruited for

---

[1] An expert witness testified that the net operating margin is basically the same as the net revenues before taxes. In this case the net operating margin was 40% of the net operating revenues of Bush's practice.

[2] Exhibit 1 at ¶ 10.2. Although the agreement is not dated, Bush testified that he signed the agreement in 2002.

[3] Exhibits 3, 4 and 5 respectively.

2

OCA, was an OCA shareholder, and served as a member of OCA's board of directors (the "Board").  He also served as the chair of the business services committee, a committee charged with helping OCA and its affiliated doctors work together more productively.

In 2005 OCA had a problem with the SEC when some questionable accounting entries that had been made by Bart Palmisano, Jr., its chief operating officer ("COO") and which were reflected in OCA's SEC filings were discovered by its independent auditors.  In May 2005 the COO was put on administrative leave by the Board pending an internal investigation of these accounting irregularities.  On June 1, 2005 during a conference call, the Board was informed that because of the accounting problems, OCA's credit with Bank of America had been frozen.  OCA began having some cash flow problems at this point.  This resulted in the late payment or nonpayment of certain bills of some of the affiliated practices, as well as late payment of profit checks to some orthodontists.  Then, on August 29, 2005, hurricane Katrina struck the greater New Orleans area where OCA's headquarters were located.  This severely disrupted OCA's business, and OCA was forced to relocate to Florida.  It is undisputed that this caused a disruption of services to affiliated practices, a delay in payment of some bills, and exacerbated an already unstable situation for OCA.

On September 8, 2005 Bush resigned from the Board due to his concerns about the management of the company.  The next day, September 9, 2005, Bush stopped making deposits into the account jointly held by Bush and OCA for the collection of the accounts receivable of his practices.  Thus, the cash flow to OCA from all of Bush's practices ceased.  On September 14, 2005 counsel for Bush sent a letter to OCA informing OCA that Bush wished to terminate his relationship with OCA and requesting that someone from OCA contact Bush to discuss the

terms of separating his practices from OCA.[4]  On October 3, 2005 Bush's attorney sent another letter that was a formal notice of default as required by the BSA.[5]  On February 17, 2006 Bush sent OCA a notice of termination, which was also required by the BSA.[6]

OCA and most of its subsidiaries filed Chapter 11 petitions under the Bankruptcy Code on March 14, 2006.[7]  A small number of additional subsidiaries filed Chapter 11 petitions on March 17, 2006 and June 2, 2006.  All of the 51 subsidiary debtors' cases have been consolidated and are being jointly administered with the main case.[8]  On April 21, 2006 OCA filed the instant adversary complaint alleging several causes of action including: breach of contract, conversion, unjust enrichment, quantum meruit, promissory estoppel, and seeking recovery on an account stated, declaratory judgment, specific performance and attorneys' fees and court costs.  Bush filed an answer and counterclaim alleging breach of contract, breach of fiduciary duty, failure to pay fees, and seeking attorneys' fees and costs.

## II.  Legal Analysis

### A.  Whether the BSA is legal under Georgia law

As a threshold issue, the court must determine whether the BSA is legal under the laws of Georgia regulating the practice of dentistry.  Bush is licensed to practice in Geargia; OCA is not.

---

[4]  Exhibit 31.

[5]  Exhibit 32.

[6]  Exhibit 33.

[7]  See title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*

[8]  For simplicity, when the court refers to OCA or the debtor, the court means all of the 52 debtor companies collectively unless it specifically names an individual company.  The use of the initials OCA also includes an entity referred to in agreements as OCS.

Bush contends that the BSA is illegal because it allows OCA to practice dentistry in violation of

Georgia law.  A Georgia statute prohibits the practice of dentistry without a license.[9]  Further, no

"person, firm, partnership, corporation, or other entity" may practice dentistry under another's

license.[10]  Section 43-11-1 of the Georgia Code specifically defines dentistry as:

> The evaluation, diagnosis, prevention, or treatment, or any combination thereof,
> whether using surgical or nonsurgical procedures, of diseases, disorders, or
> conditions, or any combination thereof, of the oral cavity, maxillofacial area, or
> the adjacent and associated structures, or any combination thereof, and their
> impact on the human body provided by a dentist, within the scope of his or her
> education, training, and experience, in accordance with the ethics of the
> profession and applicable law, including, but not limited to, the acts specified in
> Code Section 43-11-17.

Section 43-11-17 enumerates several activities that constitute the practice of dentistry, including

examining or performing operations on the human oral cavity and related structures, extraction

of teeth, creating fillings or crowns, making or repairing products used on teeth, diagnosing

dental radiographs, or holding oneself out as willing to do any of the above.  Bush does not

contend that OCA actually performed any of these types of dental services, but rather argues that

by virtue of the control exercised over his dental practice pursuant to the BSA, OCA engaged in

the unlawful practice of dentistry.

   OCA argues that it merely provided administrative support-type services to Bush that do

not cross over into the practice of dentistry.  The court agrees.  The parties signed a BSA

sometime in 2002 that purported to be effective as of September 1, 1994; the agreement further

superceded and replaced all prior agreements between the parties.[11]  The court does not need to

---

[9]  O.C.G.A. § 43-11-50.

[10]  O.C.G.A. § 43-11-51.

[11]  Section 10.2.

address whether the BSA was retroactively effective, a point the parties cannot agree upon, because even if the BSA was not retroactively effective, it was the agreement under which the parties operated at all times relevant to the question of illegality of the BSA under Georgia law. Thus, it is the document the court will examine to determine the rights of the parties.

The BSA specifically provides that OCA will provide only non-clinical, non-professional business services to Bush. Section 2 of the agreement provides that OCA will lease offices, equipment, furniture and improvements to Bush, subject to his approval. It provides that Bush shall retain control over all decisions related to office personnel and hours of practice. OCA was to purchase and maintain inventory subject to Bush's "sole authority over and responsibility for all decisions concerning the inventory and supplies" to be utilized by the practice. The BSA required OCA to provide, maintain and service computer systems as well as bookkeeping, billing, collections, bill payment and accounting services. The agreement, however, is littered with language that clearly indicates Bush is to retain control over all aspects of the practice. The Bush BSA is quite similar to the agreement in *Clower v. Orthalliance, Inc.,* 337 F.Supp.2d 1322 (N.D.Ga. 2004), wherein the court found that on a motion for summary judgment the defendant practice management company had not engaged in the unlicensed practice of dentistry as a result of the service agreement with the dentist and his professional corporation.[12]

*Clower* was decided on a motion for summary judgment and held that on its face, the BSA did not violate Georgia's prohibitions against the unlicensed practice of dentistry. In the instant case the court had the benefit of taking evidence and testimony regarding the activities

---

[12] OCA purchased Orthalliance in 2001; the agreements used by the two companies are practically identical.

6

engaged in by the parties.  Rather than showing that OCA controlled Bush's practices, as he contends, it shows the opposite.  Bush ran his own show.  He testified that he was very particular about how his office was operated and developed special protocols for his offices that were different from what OCA suggested.[13]  Bush testified that he disagreed with an OCA policy promoting greater intervals between patient visits and resisted implementing that policy.[14]  Bush held a leadership position within OCA as a member of the board of directors and as a doctor who helped OCA determine good methodologies for other doctors to follow.  Bush impressed the court as a strong willed and successful orthodontist.[15]  He did not strike the court as someone who either would or did allow OCA to control the patient care aspects of his practice.  From the evidence presented, the court concludes not only that Bush exercised a great amount of control over his practice, but also that OCA was not engaged in the practice of dentistry indirectly through its alleged control of Bush.

Bush next argues that the BSA is illegal because language contained in a Form 8-K filed with the SEC on November 4, 2005 states that OCA is an orthodontic practice.[16]  Cathy Green,

---

[13]  Trial transcript of 3/12/07 at pp. 34, 153, 157 and 179.

[14]  Trial transcript of 3/12/07 at p. 104.

[15]  At the time of the trial, Bush was operating nine offices in Georgia for orthodontic services and had gross revenue of $1,080,000.  Trial transcript of 3/12/07 at p. 108.

[16]  Exhibit 98.  The specific language Bush points to is as follows:

Before the issuance of Staff Accounting Bulletin 101 ("SAB 101") by the SEC in December, 1999, we considered ourselves to be a partner in nationwide orthodontic practices and considered our revenues to be derived from direct services to patients.  After SAB 101, and after long discussions with our accountants and the SEC staff, we revised our view and considered ourselves an orthodontic practice support firm whose revenues were derived from administrative services to our doctors, and we developed new systems to

the chief accounting officer and interim chief financial officer for OCA, who joined the company

in April 2005, testified that OCA was behind in its SEC filing because of the previously

mentioned accounting problems that had been discovered by OCA's independent auditors.  She

stated that the Form 8-K filed on November 4, 2005 was filed hastily after a demand by the New

York Stock Exchange that an updated document be filed immediately.  She testified that

although her job was to review these types of documents before they were filed, she was not able

to do so in this case, and therefore, the document was not properly reviewed prior to being filed.

She also testified that once she learned of the referenced language, she made attempts to file an

amended 8-K but could not get that accomplished while the company was still public.  Now that

OCA is no longer publicly traded, it is not possible to file an amended 8-K to correct the

---

calculate revenue under this new concept and under SAB 101.

With the issuance in December 2003 of revised Financial Accounting Standards
Board Interpretation No. 46 ("FIN 46"), we again tested our relations with our
doctors and determined on the basis of the FIN 46 guidance that we were indeed
an orthodontic practice for financial reporting purposes and therefore must
recognize our revenue on that basis under SAB 101 and FIN 46.  This new
approach required us to develop a new methodology and system to calculate
revenue.  Our financial group, in consultation with our auditors, developed a
new revenue/receivable computation methodology that we believed was
appropriate and complied with SAB 101 and FIN 46.  During the first quarter of
2005, our auditors became uncomfortable with our mutually agreed upon 2004
revenue recognition method.  We then began trying to work with our auditors to
perfect this method.  However, because we are the only publicly traded
orthodontic practice, we have no peer guidance or rulings to look to for
assistance in developing methods that comply with SAB 101 and FIN 46.  Thus,
very little progress was made over the next several months.  Consequently, we
had previously issued a non-reliance notice based on these events.  While in the
process of applying and refining a new methodology, hurricane Katrina struck
and our attention necessarily turned to this crisis.  We have now refocused on
our methodology to allow us to complete our 2004 financial statements and our
2004 audit.  The results of this new methodology may affect our financial
statements, but the effect is unknown at this time.

statements in the 8-K that are incorrect.[17]  The court found Ms. Green's testimony to be a credible explanation of why the language in the Form 8-K, which was inconsistent with all of the other SEC documents filed by OCA, was included in that document.  The court rejects Bush's argument that this one mistakenly filed document is the sole indicator of the nature of OCA's relationship with the affiliated practices to the exclusion of all of the other documents that delineate differently the relationship between OCA and its affiliates.  The court finds that the statements in the Form 8-K filed by OCA on November 4, 2005 that it was partners with orthodontists nationwide are not sufficient to show that OCA is engaged in the illegal practice of dentistry in Georgia.

Bush also puts forth the argument that the BSA is illegal because partnerships between an orthodontist and a corporation are prohibited, and the arrangement between Bush and OCA constituted a partnership .  This argument is largely based on the language contained in the 1994 and 1995 letter agreements[18] and the Form 8-K discussed above.[19]  Under Georgia law, a partnership is defined as "an association of two or more persons to carry on as co-owners of a business for profit."[20]  Georgia courts have found that the question of whether a partnership exists is a factual one, stating:

> Factors that indicate the existence of a partnership include a common enterprise, the sharing of risk, the sharing of expenses, the sharing of profits and losses, a joint right of control over the business, and a joint ownership of capital.  But the

---

[17]  Trial transcript of 3/8/07 at pp. 119-28.

[18]  As previously pointed out, the BSA signed in 2002 superceded all prior agreements. *See* pages 5-6, *supra*.

[19]  Exhibit 98.

[20]  Ga. Code Ann., § 14-8-6(a).

intention of the parties is the true test of whether there is a partnership.[21]

Regarding the 1994 and 1995 letter agreements referring to the relationship as a partnership, the court finds that the BSA signed in 2002, which clearly states that the relationship is not a partnership, superceded the earlier letter agreements.  As explained above, at trial evidence was introduced that showed the 2005 Form 8-K was an aberration that was erroneously filed.  Evidence was also introduced at trial to show that the parties did not share the risk; when opening the Super PC offices, OCA bore 100% of the risk for the first two years of operation.[22]  If the Super PC was then profitable, Bush was required to pay back some of the costs of construction.[23]  Expenses were not shared.  Although OCA actually paid the bills, Bush was responsible for funding 100% of the operating expenses of his office.  Evidence also showed that there was not joint control over the business.  Although many decisions were made with the input of both parties, Bush ultimately retained the control over final decisions.  There was no joint ownership of capital; OCA owned the assets of the orthodontic offices and leased them to Bush, and Bush was required to purchase his practices from other orthodontists or pay some of the start-up costs of the new PCs if they were successful.  The parties did not file partnership tax returns.  Finally, the evidence showed that at the relevant times it was not the intention of the parties to be a partners.  Overall, the weight of the evidence presented leads the court to conclude that the relationship between Bush and OCA was not a partnership.  Therefore, the court finds that the relationship between the parties was not an illegal partnership between a corporation and

---

[21] *Accolades Apartments, L.P. v. Fulton County*, 556 S.E.2d 552 (Ga. App. 2001).

[22] All but two of Bush's practices at the time of trial were Super PC offices.

[23] *See* Exhibit 3, Amendment to the BSA at section 2.

10

an orthodontist in violation of Georgia law.

**B.      The breach of contract claims**

Because the court has determined that the BSA is not illegal under Georgia law, the court

will next examine the breach of contract claims.  Bush argues that OCA breached the contract by

failing to pay his office expenses as required by the BSA, failing to provide the requisite

business and administrative support services as set forth in the BSA, failing to maintain Bush's

business and financial records in accordance with generally accepted accounting practices,

improperly calculating service fees resulting in an overpayment of these fees by Bush,

overcharging for center expenses, failing to pay timely patient refunds, overcharging Bush for

advertising costs, overcharging for corporate allocations, failing to pay Bush fees earned through

mentoring other orthodontists, failing to pay Bush his profits from the third quarter of 2005,

wrongfully retaining profits earned by Bush in the second quarter of 2005, failing to credit

payments made by Bush on loans, rescinding amounts paid to Bush for recruiting, and failing to

perform post-termination obligations.

OCA argues that it is Bush that breached the contract by ceasing to deposit patient

revenues into the account jointly held by Bush and OCA, otherwise failing to remit payments

due to OCA, failing to pay the monthly service fee as required by the BSA, engaging in acts

violative of restrictive covenants in the BSA, retaining and using equipment and other property

belonging to OCA without paying for it as required by the BSA, retaining, using, and/or

disclosing OCA's proprietary information without its consent, and refusing to repay loans.

The Restatement (Second) of Contracts defines a breach, stating, "when performance of a

duty under a contract is due any non-performance is a breach."[24]  Bush presented much evidence

and testimony to the effect that over the years of their association, OCA had not performed under

the BSA to his satisfaction.  Many of these claims were for actions by OCA over the life of the

contract.  Even if Bush is correct that OCA breached the terms of the BSA, the court finds that

Bush may not maintain an action for breach of contract for actions that took place several years

ago.  As the court stated in *Clower:*

> A party's right to pursue remedies for breach must be asserted promptly.  At the
> point of breach, a party may continue the contract or refuse to perform.  If the
> breach is material, the non-breaching party must choose one of two inconsistent
> rights; they may either allege a total breach, terminate the contract and bring suit,
> or honor the contract, declare the default only a partial breach, and recover on
> those damages caused by a partial breach.  When a party knows a contract has
> been breached and continues to perform or accept performance under that
> contract, that party can be said to have made an election.  In opting to continue
> the contract and receive benefits under that contract, the non-breaching party has
> ended its right to refuse to perform his part of the contract.[25]

Further, in Georgia, when parties depart from a contract's terms, and pay and receive money

under that departure, they cannot enforce the exact terms of the agreement without giving

reasonable notice of the intention to do so to the other party to the contract.[26]  Mutual departure

from one term of the contract, however, does not affect the other terms of the contract.[27]

    Here, the evidence showed that Bush was aware of the actions by OCA, actions that he

now complains of, for years before he decided to terminate the contract.  In fact his claim for

damages on its face shows that nothing with respect to OCA's performance was new.  Bush

---

[24]  Restatement (Second) of Contracts § 235(2).

[25]  *Clower* at 1331 (internal citations omitted).

[26]  Ga. Code Ann., § 13-4-4.

[27]  *Hopper v. M&B Builders, Inc.,* 583 S.E.2d 533 (Ga. App. 2003).

claims that, "he found himself responsible for many administrative and operational duties which were OCA's obligations under the agreement."[28]  Bush testified that he spent three to five hours each week between 1995 and 2002 doing work that OCA was supposed to do under the contract, and he makes a damages claim for lost profits in the amount of $805,261 based on this.[29] Similarly, Bush argues that he incurred lost profits of $586,138 between the years 2003 and 2005 as a result of OCA's failure to provide services to his Super PC offices.  Because both of these claims are for OCA's actions from the beginning of its relationship with Bush, and Bush accepted OCA's performance over this long period of time, Bush cannot now maintain a breach of contract claim alleging that OCA's performance was substandard or defective for a period of ten years.  This claim is dismissed.

Bush next argues that he was overcharged by OCA for advertising in the amount of $163,332.  Bush used OCA's advertising services extensively while he was affiliated with the company.  There was testimony that Bush discovered in 1999 that he was being charged more than other doctors for advertising because of the way the costs were allocated and that he spoke with senior management at OCA about this.[30]  Bush apparently had his concerns in 1999 resolved to his satisfaction, or if not, he chose at that time to take no further action.  After doing nothing for six years after his initial discovery of the problem, Bush cannot now maintain a breach of contract claim based on the stale claims of advertising expenses overcharges.  Bush presented evidence to support his claim that showed that since he has separated from OCA, his

---

[28]  Bush's post trial memo at p. 13.

[29]  Trial transcript of 3/9/07 at p. 202.

[30]  Trial transcript of 3/9/07 at p. 182.

advertising costs have been less than they were when he was affiliated with OCA.  The damages amount calculated by Bush for advertising overcharges were based on a comparison of the amount he was charged during the last year he was affiliated with OCA, and the amount of expense he incurred during his first year on his own.  Because Bush is paying less for advertising now than he was paying to OCA for their marketing services does not prove that he was overcharged.  OCA's marketing director testified that Bush was paying not only for the cost of the advertising itself, but also for the other marketing services provided by OCA.[31]  Bush did not address the costs of these other services in his claim and did not carry his burden of proof with respect to this claim.  The claim is dismissed.

Bush argues that he was overcharged by OCA for the allocation of corporate level expenses in the amount of $138,995.  The evidence showed that OCA allocated corporate level expenses as a percentage of case starts and not as a percentage of revenues, as called for in the 1995 letter agreement.  The evidence also showed, however, that OCA did not charge doctors for many items that it could have properly charged as a corporate expense, and if it had, then Bush would have paid more for corporate overhead than he was actually charged by OCA.[32] Additionally, in 2003, OCA stopped allocating corporate expenses altogether, so for the last two years of his association with OCA Bush paid no portion of the corporate overhead that could have properly been allocated to him under the terms of the BSA.[33]  Bush did not carry his burden of proof for his claim that he was overcharged for corporate expenses.  The court dismisses this

---

[31]  Trial transcript of 3/6/07 at pp. 180-83; 188-92.

[32]  Trial transcript of 3/8/07 at pp. 200-02; Exhibit 390 at 4A and 4B.

[33]  Trial transcript of 3/8/07 at pp. 195-96.

claim.

Bush next argues that he was overcharged for medical insurance for office employees between 2002 and 2005 in the amount of $254,063.  No evidence was presented that convinced the court that OCA overcharged Bush for medical insurance expenses.  The evidence showed that each practice paid a portion of the expenses for each participant, and this was charged to Bush as a practice expense.[34]  This claim is dismissed.

Bush also makes a claim for breach of contract based on events immediately prior to his actions in September 2005.  Because these events occurred within a time frame reasonably proximate to Bush's actions in terminating the contract, they do not suffer from the same temporal defects as those actions addressed above.  According to the testimony presented, Bush became concerned about the ability of OCA to keep performing its duties under the BSA when he did not receive his profit check for the first quarter of 2005 when he should have.  Bush stated that the profit check was due the first week of May 2005.  When he did not receive it, he made two separate phone calls to OCA and was told the check was in the mail, even though it was not.  Bush finally received the check at the end of May 2005.[35]

Then at an emergency Board meeting called on June 1, 2005, Bush learned that Bart Palmisano, Jr., OCA's chief operating officer, had been suspended for his role in making improper accounting entries in OCA's corporate financial records and that OCA was having cash flow problems, specifically that OCA's lender, Bank of America, had frozen OCA's line of

---

[34]  Trial transcript of 3/8/07 at pp. 203-04; Trial transcript of 3/14/07 at pp. 255-56.

[35]  Trial transcript of 3/12/07 at pp. 77 & 70-80.

credit as a result of which OCA did not have sufficient operating funds.[36]  Bush testified that he

then became concerned about the status of his second quarter profit check and called Howard

Mason in OCA's accounting department to determine the status of that check.  He was first told

it should be for $125,000, but that number was not certain because the second quarter had not yet

ended.  Bush called again after the quarter had ended and Mason told him the profit check should

be for $95,000 but that Bush's financial records had been pulled by a member of OCA's

management, Dr. Dennis Buchman.  Bush waited another week and called again and this time

was told his check would only be for $14,000 because Dr. Buchman had told the accountant to

remove $80,000 from his profit check for payment of Bush's loans to the company.  Bush made

several phone calls after this with the eventual result being that OCA retained $40,000 towards

loan payments and Bush received a second quarter check for $54,000 in August 2005.[37]

There were two related agreements in effect at this point.  First, there was the BSA

signed in 2002 that related to Bush's regular offices, Cascade and Macon, which were paid for in

full at some time before September 2005 when Bush stopped depositing.[38]  Second, there was the

February 1, 2004 amendment to the BSA together with its subsequent amendments (the

"amendment").  The amendment outlines the agreement of the parties concerning the new Super

PC offices that Bush opened.[39]  Under the amendment, OCA initially provided the loans to open

---

[36]  Trial transcript of 3/12/07 at p. 65.

[37]  Trial transcript of 3/12/07 at pp. 81-90.

[38]  Bush testified that these two offices had been paid for in full, and he did not owe OCA anything in connection with these offices.  Trial transcript of 3/12/07 at p. 22.  OCA did not contradict this.

[39]  Exhibit 3.

these offices with the understanding that Bush would be responsible for 60% of the development

costs as defined in the agreement, and OCA would be responsible for the remaining 40%.  There

was also a start-up loss loan that Bush would be required to pay back in full.  Additionally, the

amendment had several sections where the pre-printed language had been altered by handwritten

terms that related to interest-free advances to Bush.[40]  The gravamen of these handwritten

alterations was that Bush was to receive an interest-free advance of $50,000 per office, the

advance would be tied to a specific office, and the advance would be treated like the start-up loss

loans for purposes of repayment.[41]  If any of the new offices were unprofitable after two years,

however, then Bush would no longer be required to pay back the development cost loans, the

start-up loss loans or the interest-free advances.[42]  Finally, the amendment provided that, "the

Designated Offices' [or Super PC offices'] financial results will not be aggregated with the

Existing Offices' financial results."[43]

　　　　Bush testified that of the nine Super PC offices he opened, only one, the McDonough

---

[40]  Exhibit 3 at sections 2(b), 2(e) and 3(b).  These changes were made at the request of
Bush and both he and an OCA representative initialed the changes.

[41]  Bush testified, however, that despite this agreement, he did not actually receive a
$50,000 advance for each office.  Rather, he received one lump sum advance of $200,000 that he
understood to be pro-rated between the first three Super PC offices he opened, McDonough,
Midtown and a third unspecified office location.  Bush initially testified that Cobb was the third
office location, but later testified that it was not and that he was not sure which was the third
office location.  Trial transcript of 3/12/07 at pp. 24-26; 151; 162-63; 167-71.  After receiving
that initial $200,000 advance for his first three Super PC offices, Bush then received $35,000
advances for the remaining offices instead of the $50,000 specified in the amendment.  Trial
transcript of 3/12/07 at pp. 167-71.

[42]  Exhibit 3 at sections 2(d) and (e).

[43]  Exhibit 3 at section 8(b),i.e., in Bush's case the Super PC offices' financial results
were not to be aggregated with the results from his Cascade and Macon offices.

practice, was profitable as of August 2005.[44]  Two others, Midtown and Cobb, had closed before

August 2005 because they were unprofitable.[45]  The testimony from OCA's representative,

Anthony Paternostro, did not contradict this.[46]  Thus, the court finds from the facts presented that

when Bush attempted to contact OCA about his second quarter profit check sometime in late

June or early July, the only "designated office" he was obligated to make payments for under the

terms of the amendment to the BSA was for the McDonough practice.  OCA attempted to

withhold $80,000 from Bush and ultimately withheld $40,000 after he argued with OCA about

withholding the $80,000.  Under the terms of the amendment, the payments on McDonough

were to be repaid in 60 equal monthly payments, not in large lump sums taken at OCA's

discretion.

Paternostro testified that OCA requested Bush begin repayment of the start up costs and

construction costs for the Super PC practices in the second quarter of 2005, i.e., the attempt to

withhold $80,000 from Bush's profit check, and that Bush was unhappy with this request.[47]

Paternostro went on to state:

> Payment of the compensation advances for all of our doctors, where it be Super
> PC or non-Super PC offices, those are made out of the first profits of the offices,
> so the advances build until such time that those offices can pay for them and then
> those interest-free advances are paid down first.  So, Dr. Bush had both Super PC
> and non-Super PC offices.  The Super PC offices, as we talked about, were
> phased in if you will, and the first ones, specifically McDonough for instance, the

---

[44]  Trial transcript of 3/12/07 at p. 45.

[45]  Trial transcript of 3/12/07 at pp. 26-28.

[46]  Bush's expert testified that as of September 30, 2005, three of Bush's Super PC offices
were profitable.  The other testimony indicates, however, that as of June 30, 2005, i.e., the
second quarter, only McDonough was profitable.

[47]  Trial transcript of 3/5/07 at p. 81.

> very first Super PC office, was very successful, very profitable.  His non-Super
> PC offices were very profitable.  So, they did have the wherewithal to pay debt
> and the compensation advances are the first component of debt that are paid under
> the contract.  So, I believe we had the right under the contract to receive
> payment.[48]

OCA appears to have taken the position that because Bush had one profitable Super PC office

and two profitable non-Super PC offices, he was suddenly responsible for repayment of all loan

amounts due OCA.

The February 1, 2004 amendment to the BSA outlines the agreement of the parties as to

the development costs for the new Super PC offices that Bush opened.[49]  OCA initially provided

the loan to open these offices with the understanding that Bush would be responsible for 60% of

the development costs as defined in the agreement, and OCA would be responsible for the

remaining 40%.  There was also a start-up loss loan that Bush would be required to pay back in

full.  Section 2(c) to the amendment states that the repayment of Super PC loans, "shall be made

in 60 equal monthly consecutive monthly installments of principal and interest, with payment to

begin on the earlier of (i) the date that the practice at such Designated Office first attains

profitability, or (ii) subject to subsections 2(d) and 2(e) below, the second anniversary of the

Center Operational Date of such Designated Office."[50]  Bush testified that as of mid-2005, before

the second quarter profit check was due him, he had made $447,000 in extra payments that he

had directed OCA to apply towards the McDonough office.[51]  Although it appears from the

---

[48]  Trial transcript of 3/5/07 at p. 82.

[49]  Exhibit 3.

[50]  Exhibit 3 at section 2(c).

[51]  Trial transcript of 3/12/07 at pp. 46-47.

19

records presented to the court in the expert reports that OCA did not actually apply the full

$447,000 in extra payments to the McDonough office as requested by Bush, $388,112 was in

fact applied to the McDonough office.[52]  Thus, according to OCA's own records, which reflect

that Bush owes more for McDonough than Bush claims to owe, at the time OCA attempted to

withhold $80,000 from Bush's second quarter 2005 profit check, Bush owed a total of $65,427

in principal for development costs and $98,766 in associate compensation for the McDonough

office as of the end of September 2005.  If this is added up and divided over sixty equal monthly

payments, the result is $2737 per month, a great deal less than the $80,000 that OCA attempted

to withhold from Bush, and a good deal less than the $40,000 OCA actually withheld from

Bush.[53]  The court finds that OCA breached the amendment by attempting to withhold more than

Bush owed for McDonough, the only office he was obligated to make a repayment for, from his

profit check.  Additionally, OCA breached the amendment because none of the Super PC offices

except McDonough were profitable at the time; thus, the profit check primarily consisted of

profits from Bush's two non-Super PC offices.  The court finds that OCA used profits from

Bush's existing offices towards debt from the Super PC offices in direct violation of section 8(b)

of the amendment.

Bush also testified that some of his office expenses were not paid prior to his decision to

stop depositing in September 2005.  He stated that pre-Katrina, 16 bills worth about $18,000

were not paid by OCA.[54]  When hurricane Katrina further disrupted OCA's business operations,

---

[52]  Exhibit 391.

[53]  The court recognizes the $40,000 number is for a quarter, and the $2,737 figure is for a
month, but the end result is the same; OCA took more than it was entitled to under the contract.

[54]  Trial transcript of 3/12/07 at pp. 91 & 95.

OCA failed to pay other bills related to Bush's practice.  Bush testified that a total of approximately $42,000 in office bills were unpaid.[55]  The court finds that OCA breached the BSA by failing to pay Bush's bills because section 2.7 of the BSA provides that OCA "shall provide the Orthodontist with all bookkeeping and accounting and related financial services reasonably required for the day-to-day operations of the Practice, including. . . administration and payment of accounts and trade payables."

The court has determined the BSA and its amendment were breached by OCA; it must next look to the magnitude and effect of the breach.  The BSA states at ¶ 6.2(ii):

> In the event OCS shall materially default in the performance of any duty or obligation imposed upon it by this Agreement and such default shall continue for a period of ninety (90) days after written notice thereof has been given to OCS by the Orthodontic Entity, the Orthodontic Entity may terminate this agreement.

The BSA does not define what is a "material" default or breach, so the court looks to the customary definition.  Whether a breach is material or not is a question of degree, which must be determined by weighing all of the circumstances surrounding the breach.  The Restatement (Second) of Contracts offers some guidelines as to the factors that a court might consider in making the determination:

> In determining whether a failure to render or offer performance is material, the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the extent to which the party failing to perform or to offer to perform will cure

---

[55] Trial transcript of 3/12/07 at pp. 94-96.

his failure, taking account of all the circumstances including any reasonable
assurances;
(e) the extent to which the behavior of the party failing to perform or to offer to
perform comports with the standards of good faith and fair dealing.[56]

The question of whether a breach is material is a question of fact.  It has been said that the best

indication of the true intent of the parties as to the materiality of the breach is their treatment of

it.[57]  The court will analyze the actions of the parties under this set of guidelines

     OCA breached by failing to pay Bush's center expenses timely prior to Hurricane

Katrina and failing to pay Bush $40,000 of his quarterly dividend.  Although these actions did

not involve large amounts of money compared to the total size of Bush's practices, the object of

the BSA was for Bush to receive business administration services from OCA.  By failing to pay

expenses timely, OCA failed to perform an integral part of the contract.  A second object of the

contract was for Bush to receive payment for his work.  By wrongfully withholding money from

Bush's profit checks and making late payment of those checks, OCA again failed to perform an

important part of the contract.  Bush stopped making deposits to the joint account on September

9, 2005 and notified OCA of this via letter dated September 14, 2005.[58]  There was no response

to these actions from OCA, and on October 3, 2005 Bush sent a notice of default to OCA.[59]

Again there was no response from OCA.  On February 17, 2006 Bush sent a letter of termination

to OCA stating that he wished to assume all debt, assets and contracts related to the practice and

---

[56]  Restatement (Second) of Contracts § 241.

[57]  Williston on Contracts § 63:3.

[58]  Exhibit 31.

[59]  Exhibit 32.

requesting the relevant financial information needed to terminate the contract.[60]  No response

was made to this request, and no actions were taken by OCA between the October letter and the

February letter to attempt to resolve any of Bush's complaints.

Although the court recognizes that the rule in Georgia that impossibility of performance

by an act of God excuses nonperformance,[61] and the language in section 10.6 of the BSA give

OCA some leeway for its failure to perform immediately after the hurricane, this does not excuse

OCA's non-responsiveness to Bush's demands.  OCA maintains that despite hurricane Katrina's

damage to its offices, it was up and running and servicing its affiliate practices before it received

the letter of termination from Bush on February 17, 2006.[62]  Thus, given the state of affairs

between the parties immediately before the hurricane, the court can only conclude that OCA was

not interested in curing its defaults of the Bush BSA and amendment.  OCA points to no efforts

it made to contact Bush to attempt to resolve the issue.  All attempts at communication that were

entered into evidence came from Bush.  Bush waited over four months after sending the notice of

default before sending the notice of termination.

From the actions of the parties, it appears that, at least initially, OCA was not opposed to

a termination of the agreement.  In October 2005 OCA agreed to a buyout by Bush for

$5,000,000 and only made the claim that Bush did not properly terminate the agreement later

when the buyout fell through because Bush did not have and could not borrow the $5,000,000.[63]

---

[60]  Exhibit 33.

[61]  Ga. Code Ann., § 13-4-21.

[62]  Trial transcript of March 5, 2007 at pp. 86-89; 92-94.

[63]  Evidence was presented showing that in early October 2005 the parties reached an
agreement for Bush to extinguish his debt, buy the assets of his practice and terminate his

A letter of intent was signed, but for reasons not attributable to OCA the agreement was never

consummated.[64]  No further action was taken by OCA, however, and no written response was

made either to the October 3, 2005 default letter or the February 17, 2006 termination letter.

OCA complains that it was never given the opportunity to cure the breach, but the court finds

that OCA never made any attempt to cure the breach.  Instead, on March 14, 2006, OCA filed its

Chapter 11 petition and on April 21, 2006 it filed the instant adversary proceeding against Bush.

Finally, although not directly related to the BSA, Bush testified that after the June 1,

2005 Board meeting in which he learned of OCA's serious financial problems he voiced

concerns about OCA commingling profits belonging to individual orthodontic practices with

company funds, which could potentially result in a shortage of cash to make payments to

doctors.  He also voiced concerns about other actions taken by OCA's management and was told

by the president and CEO of the company to stop causing problems.  Further, Bush testified that

after the incident with his check in August 2005, even though he was a member of the Board he

was effectively cut off from communication with all senior management at the company and told

to direct any concerns that he had to his practice enhancement consultant.  The court finds that

although this was not a violation of the BSA or the amendment, the behavior of OCA's

management was such that Bush could reasonably have inferred that the company was in serious

financial trouble and would be unable to meet its future obligations to him under the BSA,

---

association with OCA in return for a payment of $5,000,000; there was no objection to this
evidence.  Exhibit 50.  Bush also testified that this amount did not include the McDonough
practice.

[64]  Bush testified that he was unable to get the financing to complete the deal.  Trial
transcript of 3/12/07 at p. 124.

especially because OCA had already breached the BSA and amendment.  The court makes note

of this because it bears on the materiality of the breach and the reasonableness of Bush's actions

in ceasing to deposit practice funds into the OCA joint account and taking over payment of his

practice expenses himself.

By weighing all of the evidence presented, the court finds that OCA committed a material

breach of the BSA.  The party who first commits a material breach cannot enforce the contract,

i.e., "a party who has materially breached a contract is not entitled to recover damages for the

other party's subsequent nonperformance of the contract, since the latter party's performance is

excused."[65]  Thus, OCA's claims that Bush breached the BSA are no longer viable.  Because it

was the first to commit a material breach, OCA lost its right to demand performance from Bush,

and Bush's actions in withholding deposits from the joint account after the OCA breach did not

constitute a default on his part.

The court next looks to the effects of Bush's termination of the BSA.  Section 6.4 of the

BSA addresses how the affairs are to be handled after termination:

> Upon termination of this Agreement by a Party for any reason or upon expiration
> of this Agreement, the Orthodontic Entity shall:
>
> (i)     Purchase all improvements, additions or leasehold improvements which
> have been made by OCS and which relate solely to the performance of its
> obligations under this Agreement at adjusted book value;
>
> (ii)    Assume all debt and all contracts, payables and leases which are
> obligations of OCS and which relate solely to the performance of its
> obligations under this Agreement or the properties subleased by OCS; and
>
> (iii)   Purchase from OCS at book value all of the equipment of the Center,
> including all replacements and additions thereto made by OCS pursuant to

---

[65] Williston on Contracts § 63:3.

the performance of its obligations under this Agreement, and all other
assets, including inventory and supplies, tangibles and intangibles, set
forth on the balance sheet prepared for the month most recently ended
prior to the date of such termination in accordance with GAAP to reflect
operations of the Center, depreciation, amortization and other adjustments
of assets shown on such balance sheet.

Section 6.5 of the BSA reads in pertinent part: "The Orthodontic Entity shall pay cash for the

repurchased assets.  The amount of the purchase price shall be reduced by the amount of debt

and liabilities of OCS assumed by the Orthodontic Entity and shall also be reduced by any

payment OCS has failed to make under this Agreement."

The parties appear to agree, and the BSA clearly states, that Bush shall purchase the

assets of his practices from OCA.  The parties seem to agree that part of this is the value of the

money OCA put up for the development costs and start-up losses of the Super PC offices.  The

parties also appear to agree that Bush is not liable for any of the development costs and start-up

losses associated with the Midtown and Cobb offices, which closed before he terminated the

BSA.  The parties further agree that Bush must repay OCA the development costs and start-up

losses of the McDonough, Carrollton and West Marietta offices that are now profitable.   There

are, however, still plenty of disagreements.  One is that OCA contends that Bush is liable for

repayment of these costs for offices that are alleged to be unprofitable, but that Bush continues to

operate, i.e., the Northlake, LaGrange, Hiram and Madison offices.  Bush contends he is not

liable for the repayment of the costs associated with those offices.  The court finds, however, that

Bush is liable for the repayment of those costs associated with these unprofitable offices.  The

amendment to the BSA states that the orthodontist shall have no obligation to repay the

development cost loans and the start up loss loans for a designated office only in the event that

the office is unprofitable, as defined in the amendment, at its second anniversary.  Bush

26

terminated the BSA before the two year anniversary of these offices; thus, the two year mark was never reached and the provision of the amendment excusing Bush from repayment was never activated.

The development costs and start-up losses of the various practices as claimed by OCA are detailed in exhibit 391. The development costs and start-up losses of the various practices as claimed by Bush are detailed in exhibit 394. The court finds the figures in exhibit 391 and the testimony presented by OCA's expert to be more persuasive and finds that those figures represent a good starting point for the court's calculation of damages. For the development costs and start-up losses, OCA claims an initial total of $2,000,073 that it expended on seven locations before any payments are applied or adjustments are made.[66] Bush testified that he had made payments in 2004 totaling $407,000 that were to be applied toward the McDonough practice, and a further payment of $40,000 in early 2005. He also is entitled to a credit for the payment that OCA withheld from his second quarter of 2005 profit check in the amount of $40,000. Thus, there should be $487,000 in payments credited. The court finds only $388,112 in payments credited to the McDonough office, and an additional $19,335 in payment credited to the Carrollton office. The court cannot find where the remaining $79,553 was applied to Bush's accounts. From the similarities in the numbers, i.e., the credited payments add up to approximately the amount Bush claims he paid through 2004, the $407,000, it seems likely that the last two payments of $40,000 each were simply not credited to this category of expenses.[67]

---

[66] Exhibit 391 at p. 2, schedule 5 revised, purchases/ startup losses.

[67] These figures come from Bush's testimony, and the court assumes that he did not give the exact numbers; this would account for a rounding error.

27

OCA failed to show that the payments were applied elsewhere, so the court will reduce OCA's

figures by this additional amount.  Thus, for the purchases/startup losses category as defined by

OCA's exhibit, the court finds the total principal balance that remains due to OCA to be

$1,512,626.  This means that OCA's accrued interest figure in this category is bound to be off as

well.  The contract calls for an interest rate of prime plus 1.5% per annum on the principal

amount.  Interest should be calculated at the contract rate until the termination date, February 17,

2006.  After termination, interest will be allowed at the federal judgment rate.

A second category, which OCA calls associate compensation, is for money lent to pay

associate orthodontists for each of the practices; for this OCA claims a total of $532,608.[68]

There is not any disagreement between the parties as to this amount, so the court will award it as

it is.[69]  The court also awards interest on this amount at the rate specified in the contract until the

date of termination, because it should be properly included in the category of start-up loss loans

under the amendment to the BSA.  After termination, the court awards interest at the federal

judgment rate.

A third category in OCA's calculations is other advances in the amount of $482,814.

This category has created significant problems for the court because OCA does not specifically

---

[68]  Exhibit 391 at p. 2, schedule 5 revised, associate compensation.  Bush's expert also
included this category in his assessment, so the court assumes these are legitimate claims by
OCA.  The amendment to the BSA states that associate compensation is to be included in start-
up loss loans, but apparently the parties chose to account for them separately in their
calculations.  Although start-up loss loans and development cost loans are both subject to the
same interest rate, OCA did not calculate interest on the associate compensation amounts in its
damages calculations.  Thus, the court will not concern itself with any interest calculations for
these amounts.

[69]  Exhibit 394 at schedule B-1 revised.

define, either in its expert report or through testimony, what exactly is in this category.  From the

testimony, it seems that this includes the amounts specified in the amendment as interest-free

advances that were included through the handwritten alterations to the amendment's pre-printed

language.  According to the language in the amendment, Bush was supposed to receive an

interest-free advance of $50,000 for each Super PC he opened; these advances were to be treated

like the start-up loss loans in terms of how they were to be repaid. The parties agree that Bush

was given an advance of $200,000 that is definitely in this category.  That advance, according to

Bush was for the McDonough and Midtown offices, and for one other unspecified office.[70]  For

the remaining offices he received $35,000 each, not the $50,000 specified in the amendment.  It

does not appear, however, that an advance was received for the Madison office.  Thus, there are

five offices for which Bush received $35,000 advances, including the Cobb office, but excluding

the Madison office.[71]  This totals $375,000 that the parties agree on.  OCA also claims that a loan

in the amount of $79,000, made prior to the amendment and unrelated to the Super PC offices,

falls into this category.[72]  Bush disputes this, but it appears to the court that this is a legitimate

claim by OCA, bringing the total up to $454,000.  The remaining $28,000 is apparently an

aggregate of small amounts that taken together bring the total up to $482,814.[73]  The court found

---

[70]  Bush was not sure which other office was included in the $200,000 amount, but he did testify that it was not the  Cobb office.

[71]  The nine offices Bush opened under the Super PC amendment were McDonough, Carrollton, West Marietta, Northlake, LaGrange, Hiram, Midtown, Cobb and Madison.  Madison was only partially begun when OCA began experiencing financial difficulties so OCA only put forth $30,387 toward initial construction costs.  Bush finished the construction of this office on his own after ending his relationship with OCA.

[72]  Trial transcript of 3/9/07 at p. 31.

[73]  Trial transcript of 3/9/07 at pp. 31-37.

OCA's expert credible and accepts this number.  This, however, does not end the matter.  Bush contends, and the court agrees, that Bush is not liable for the repayment of the interest-free advances for the Midtown and Cobb offices.  The amendment states that if any of the new offices were unprofitable after two years, Bush would no longer be required to pay back the development cost loans or the start-up loss loans.  Two of these offices, Cobb and Midtown, closed without ever reaching profitability, and OCA was responsible for 100% of those losses.  The interest-free advances related to these offices are to be treated the same as the start-up loss loans for which Bush was not responsible.[74]  The court finds that the $200,000 advance was to be split three ways, with one-third of that amount, or $66,667, credited to the Midtown office.  Bush also received a $35,000 advance for the Cobb office.  Thus, the $482,814 should be reduced by $101,667 reducing the figure that Bush owes for the repayment of these advances to $381,147.  OCA is not entitled to interest on this amount per the terms of the amendment to the BSA up until the contract was terminated.  After termination, the court will allow interest at the federal judgment rate.

OCA also asks for $1,107,214 in what it calls fixed assets and startup costs absorbed by OCA.  This amount represents the 40% of the development costs and start-up losses that OCA would have borne under the amendment if the BSA had not been terminated.  Because Bush terminated the BSA and kept the Super PC offices, the court finds that this amount is due to OCA to compensate it for the funds it expended in building the Super PC offices.  The court will allow interest on this amount at the federal judgment rate.  The interest will run from the date of contract termination.

---

[74]  Exhibit 3 at section 2(e).

In its post trial memorandum, OCA also makes a claim for $2,130,984.31, which it contends is for the purchase of the assets of the Bush offices pursuant to section 6.4 of the BSA. The court, in its review of the evidence and expert testimony, could find no support for this claim. Although OCA is undoubtedly correct that the terms of the BSA require Bush to purchase the assets upon termination of the contract at their book value, no evidence of that book value was presented, or if it was, OCA failed to direct the court to that evidence. This claim is denied as unsupported by the evidence.

Finally, Bush contends that he is owed $15,354 by OCA for OCA's share of the practice expenses that OCA did not pay prior to the time Bush terminated the contract. The court finds these expenses are the responsibility of OCA in that amount. Bush also claims that he was not paid for the cash balances of $46,972 left in his practices at the time OCA breached the contract. This would be the amount due Bush for his third quarter of 2005 profit check. OCA did not dispute either of these amounts in its post-trial memorandum, and presented no evidence that these were not correct numbers. The court awards these amounts to Bush plus interest at the federal judgment rate from February 17, 2006

OCA makes claims for lost profits due to Bush's breach of the BSA. The court did not find that Bush breached the BSA, and OCA does not point to any provisions in the BSA that supports a claim for lost profits in the event of proper termination. OCA's claims for lost profits are denied. OCA also claims that Bush engaged in acts violative of restrictive covenants in the BSA and retained, used, and/or disclosed OCA's proprietary information without its consent. As to the restrictive covenants, section 8.2(d) of the BSA states: "Notwithstanding anything in this Agreement to the contrary, the Orthodontic Entity's covenants and agreements not to compete

31

provided for in Section 8.2(c) will not apply in the event of termination of this Agreement by the Orthodontic Entity for cause pursuant to Section 5.2." The court finds that the covenants not to compete are not applicable in this case and dismisses this claim. As to the charge that Bush retained, used, and/or disclosed OCA's proprietary information without its consent, no evidence of this was presented, and the court dismisses this claim.

### C.      The debtor's remaining causes of action

The court held a trial over eight days in March 2007. At the conclusion of the debtor's case, counsel for the defendants made an oral motion for the dismissal of five counts of the debtor's complaint; the court granted the motion in part and dismissed OCA's causes of action for recovery on an account stated and specific performance. The remaining causes of action are for conversion, unjust enrichment, quantum meruit, and promissory estoppel. Because the court determined that the BSA was legal and has ruled on the breach of contract claim, the remaining claims of the debtor are superfluous and need not be resolved. The court dismisses them as moot.

### D.      Bush's remaining causes of action

The court will address Bush's causes of action that are unrelated to his breach of contract claims in turn. First, Bush alleges breach of fiduciary duty. Under Georgia law, "a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach."[75] Section 23-2-58 of the Georgia Code states:

Any relationship shall be deemed confidential, whether arising from nature,

---

[75] *Bienart v. Dickerson*, 624 S.E.2d 245 (Ga. App. 2005).

32

created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.

The Georgia courts have held that the party asserting the existence of a fiduciary or confidential relationship bears the burden of proving its existence.[76]  "Because a confidential relationship may be found whenever one party is justified in reposing confidence in another, the existence of a confidential or fiduciary relationship is generally a factual matter."[77]

The court finds that there was a fiduciary relationship between OCA and Bush: OCA was responsible for many of the financial aspects of Bush's practice contractually through the BSA. Additionally, although the court found that Bush retained a great degree of control over the aspects of his practice that actually involved the treatment of patients, OCA did manage the financial aspects of Bush's practices.  Thus, the court must next look to whether the fiduciary duty was breached by OCA.  Section 10-6-22 of the Georgia Code states: "An agent for hire shall be bound to exercise, about the business of his principal, that ordinary care, skill, and diligence required of a bailee for hire.  A voluntary agent, without hire or reward, shall be liable only for gross neglect."  The court finds that OCA owes only a duty of ordinary care to Bush in its conduct of his affairs.  The court finds that OCA did not breach this duty.  Although evidence was presented that OCA had some accounting problems due to Bart Palmisano, Jr.'s activities, it was not proved that these accounting problems had anything to do with Bush's practice; rather, that they were primarily concerned with OCA's international subsidiaries.  Additionally, while

---

[76] *Id; Yarbrough v. Kirkland,* 548 S.E.2d 670 (Ga. App. 2001).

[77] *Bienart* at 249.

Bush argues that OCA overcharged him for several things, it was the court's impression that it was not an improper overcharge in the sense that mistakes or deliberate false accounting entries were made related to Bush's accounts, but rather that Bush disagreed with the amount he was being charged, and that disagreement arose well after the fact. OCA does appear to have had some difficulties with its books, and the court finds that OCA's records are not particularly transparent or easy to follow. Again, however, the court finds that although OCA was not perfect, it acted with ordinary care to maintain Bush's books and records. Thus, the court finds that Bush did not prove any breach of OCA's fiduciary duty to him.

Bush next argues that OCA failed to pay the fees earned by Bush for serving on the board of directors. Bush testified that he was not paid for the second and third quarters of 2005 for his service on OCA's Board. He further testified that he was owed $6,250 per quarter for this service. No evidence was presented to contest that claim. The court finds that OCA owes Bush $12,500 for serving on the Board in the second and third quarters of 2005.

Bush also argues that OCA failed to pay fees he earned for serving as a mentor to other orthodontists. Bush testified that under a separate agreement with OCA, he was providing mentoring services to Drs. Echols and White. Exhibits introduced at trial show that Bush was paid a mentoring fee quarterly for each of these orthodontists from the second quarter of 2002 through the first quarter of 2005, a period of three years.[78] Bush testified that there was an agreement as to the mentoring program, but that it was not in writing. He produced a power point slide generated by OCA for a meeting about the mentoring program, which showed the terms of the purported agreement as follows:

---

[78] Exhibits 178-190.

> 10 OCA doctors who have demonstrated business acumen and who want to do more with OCA were selected
>
> They will recruit doctors and with OCA establish practices
>
> They will mentor new doctor and help him with OCA to grow
>
> OCA will invest all capital, but the mentor will retain 10% of OCA's interest
>
> Mentor's interest may be put to OCA for the lesser of OCA trading multiple or 10 times after 3 years[79]

Bush's expert testified that this meant that in addition to the sums Bush was paid quarterly as mentoring fees, Bush was to receive an additional sum at the end of three years of mentoring.[80] Bush also testified that he expected to receive an additional sum at the end of the three years of mentoring.  According to Bush's expert, OCA owed Bush an additional $257,480 for mentoring Dr. Echols and $741,360 for mentoring Dr. White.  This was calculated by taking the amount of the last quarterly mentoring fee for each doctor, multiplying it by four to get an annual amount, and then multiplying the annual amount by ten for the end result.[81]  The court cannot accept this calculation or this speculative evidence for at least two reasons.  First, there was no evidence other than the testimony of Bush that this was actually the agreement between the parties; there was no contract incorporating this language, and OCA denied that this was the form of the mentoring agreement between the parties.  Second, even if the OCA power point slide produced by Bush outlining the mentoring arrangement is accepted by the court as a firm agreement between OCA and Bush, it states that the mentor's interest may be put to OCA for the *lesser* of

---

[79]  Exhibit 295.

[80]  Trial transcript of 3/14/07 at p. 67.

[81]  Trial transcript of 3/14/07 at 67.  Exhibit 389 at A-21.

the OCA trading multiple or ten times after three years.  There was no evidence presented as to
what the OCA trading multiple was, nor were the terms of this arrangement defined in the power
point slide in such a way as to allow the court to ascertain with any confidence what exactly the
parties intended as to a final payment.[82]

The only evidence the court could find of a contract relating to the mentoring agreement
was contained in sections 3(c) and 5 of the amendment to the BSA.[83]  The agreement outlined in
that contract is not the same agreement Bush alleges but instead supports the theory that the
mentoring fees Bush received between 2002 and 2005 were the only compensation he was
entitled to receive for his mentoring services.  Because Bush produced no evidence of the alleged
agreement other than the OCA power point slide outlining its purported terms, the court declines
to award almost one million dollars to Bush for this claim.  The evidence showed that Bush was
paid over the course of three years for his mentoring services, and the court concludes that those
payments comported with the terms of the amendment cited above.  The claim for additional
mentoring fees is dismissed.

### E.    Assumption of the BSA

OCA also moves to assume the BSA pursuant to section 365 of the Bankruptcy Code.
Because the BSA was terminated before OCA filed its Chapter 11 petition, there is no contract to
assume; section 365 applies only to executory contracts.   Once a contract has been terminated it

---

[82]  Trial transcript of 3/14/07 at pp. 193-95.

[83]  Exhibit 3.  Section 3(c) provides that in consideration for mentoring services, OCA
will remit to Bush quarterly an "amount equal to 40% of the aggregate amount" of OCA's
performance fee with respect to each designated office.  Section 5 outlines the mentoring duties
Bush agrees to undertake for this fee.

is no longer executory.  The motion is denied.

### F.      Attorneys' fees and costs

Section 10.10 of the BSA states:  "If legal action is commenced by a Party to enforce or defend its rights under this Agreement, the prevailing Party(ies) in such action shall be entitled to recover its costs and reasonable attorneys' fees in addition to any other relief granted."  Because of the intertwined and complicated legal issues presented in this case and the multiple causes of action alleged, most of which are not granted, the court cannot say that either party is the prevailing party in this action.  Each party prevailed in some parts of the litigation but lost in most.  Therefore, each party shall bear its own costs and attorneys' fees.

## III.    <u>Conclusion</u>

The court finds that OCA breached the contract and that Bush properly terminated the contract.  As a result, Bush is obligated to pay OCA $3,533,595 plus interest at the various rates discussed above.  OCA failed to pay Bush his fees for serving on the board of directors, and certain other sums owed to Bush under the BSA in the amount of $74,826 plus interest as discussed above;  the sum Bush owes shall be reduced by this amount.

New Orleans, Louisiana, October 9, 2007.

*J. A. Brown*
Jerry A. Brown
U.S. Bankruptcy Judge